IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JAN 3 0 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

TORRANCE JONES, # 19267 - 018
FCI- Peters, Plaintiff,
PE Box 1000
v. Petersburg, VA 23804

DRUG ENFORCEMENT
ADMINISTRATION, et al.
                    Defendants.
_____/

Case: 1:13-cv-00123
Assigned To : Jackson, Amy Berman
Assign. Date : 1/30/2013
Description: FOIA/Privacy Act

## COMPLAINT UNDER THE FREEDOM OF INFORMATION ACT (FOIA)
## 5 U.S.C. § 552(a)(4)(B) and PRIVACY ACT 5 U.S.C. § 552a

NOW COMES, Plaintiff, TORRANCE JONES, proceeding Pro Se, and requests that this Court grant this petition and order the Drug Enforcement Administration, et al. to disclose in their entirety Plaintiff's co-defendant statements that are being erroneously withheld under exemption (b)(7)(c). Plaintiff overcomes the exemption because the statements have been placed into the public domain. Based on the facts and laws set forth below:

### JURISDICTION

Plaintiff received a final decision on December 14, 2010 from the administrative remedies. Under both the Freedom of Information Act 5 U.S.C. § 522 and the Privacy Act 5 U.S.C. § 522a this complaint is timely and the claim should be adjudicated on the merits.

### FOIA PROCEDURAL HISTORY

On May 29, 2010, Plaintiff filed a Freedom of Information and Privacy Act requesting the complete statements set forth in Plaintiff's presentence report which are statements by: Richard Mann on May 15, 1996; Michael Rubel on July 29, 1996; Ricky Draper on September 15, 1996; Daniel Dunning on July 29, 1996.

- 1 -

Exhibit 1. Also, Bernard Sinclair statements on September 15, 1996.

On June 24, 2010, the Drug Enforcement Administration acknowledged that they had received Plaintiff's FOIA and Privacy Act request case No. 10-00572-FP.

On September 1, 2010 the Drug Enforcement Administration (hereafter DEA) released 25 pages and withheld 1. However, the DEA did not even "processed" Plaintiff request for statements of his co-defendant (i.e. Mann, Rubel, Draper, Sinclair, Dunning, and Eversole) and went on further and held: "this response neither confirms nor denies the existence of any requested records." Exhibit 2.

On September 14, 2010 Plaintiff filed an appeal in Case No. 10-00572-FP. Further, seeking to have Plaintiff's co-defendant's statements released.

On December 14, 2010 Plaintiff's appeal was denied because of exemption § 552(b)(7)(c). Exhibit 3.

BACKGROUND ON PLAINTIFF'S CRIMINAL CASE
UNITED STATES v. TORRANCE JONES, CASE NO. 5:96-CR-79-1-BO
EASTERN DISTRICT OF NORTH CAROLINA

On April 23, 1996 Plaintiff was indicted for conspiracy to possess with intent to distribute cocaine and cocaine base 21 U.S.C. 846 and 21 U.S.C. § 841 (a)(1); Possession with intent to distribute cocaine 21 U.S.C. § 841 (a)(1); and Possession with intent to distribute cocaine base 21 U.S.C. § 841 (a)(1).

On          , 1996, Plaintiff's counsel, Bridgett Aguirre filed a motion for discovery that requested the government to turn-over all Brady material. Counsel's discovery motion was granted.

On July 8, 1996, Richard Mann entered into a plea agreement in open court and the Memorandum of Plea Agreement was signed by Mr. Mann and Assistant U.S.

Attorney Christine B. Hamilton. Page 6 and paragraph G of the plea agreement states: "The self incriminating information provided by the defendant pursuant to the debriefing letter May 13, 1996 shall not be used against the defendant."

On September 16-18, 1996, Plaintiff went to trial and several government witnesses testified. Michael Rubel, Richard Mann, Agents Brad Kennon and Anthony Wisniewski testified during trial on the government's behalf and publicly testified to their statements and about other co-defendants (i.e. Daniel Dunning, Brain Eversole, Ricky Draper, and Bernard Sinclair) statements.

During Mann's testimony, Plaintiff's counsel Bridgette Aguirre objected that she had not received statements that Mann had made to AUSA Christine B. Hamilton and Investigative Agents Kennon and Wisniewski. However, AUSA Christine B. Hamilton contested counsel's objection and stated "all statements had been provided to counsel." Thereafter, the District Judge Terrence W. Boyle denied Plaintiff's counsel's objection.

On January 3, 1997 after Plaintiff has been found guilty by the jury Plaintiff's co-defendant, Milton Lewis' attorney, Susan Seaborn had received his presentence report (PSR) and discovered statements by Mann, Rubel, Dunning, Eversole, and Draper that were never turned over during the discovery phase. Thus, attorney Seahorn wrote AUSA Christine Hamilton a letter stating:

> "As you know, I on Mr. Lewis' behalf, was never supplied with these statements [i.e. in the PSR] either as part of discovery, pursuant to Jenck or Brady material for cross-examination based on the inconsistency of statements." See, Exhibit 4.

During the beginning of January, 1997, Plaintiff received his presentence report (hereafter PSR) and on pages 7-9, Plaintiff discovered Richard Mann's May 15, 1999 statement, Daniel Dunning's July 24, 1996 statement, Michael Rubel's July 29, 1996 statement, Brian Eversole's July 29, 1996 statement, and Ricky

- 3 -

Draper's September 15, 1996 statement, which were all withheld from Plaintiff. All the above mentioned statements were obtained by Christine Hamilton and investigate agents Brad Kennon and Anthony Wisniewski prior to Plaintiff's trial. See, Exhibit 5.

On January 28, 1997, Plaintiff had a sentencing hearing. During the sentencing hearing Agent Kennon testified about Michael Rubel's statements, Richard Mann's statements, and Ricky Draper's statements. Also on January 28, 1997 Richard Mann sentencing hearing, took place and Mann's Attorney stated to District Judge Boyle:

> "That immediate cooperation resulted in an initial debriefing, actually at the courthouse, and a subsequent debriefing by Agent [Brad] Kennon and others at the jail."

Last, on January 28, 1997 during Michael Rubel's sentencing hearing AUSA Christine Hamilton made it clear that:

> "In this particular case I have also met with this defendant on numerous occasions..." concerning Rubel's cooperation and being debriefed.

On January 18, 2000 Bernard Sinclaire stated in an affidavit: "I was interviewed by investigative agents Brad Kennon and Anthony Wisniewski and after informing them that, I didn't traffic drugs for Torrance Jones to North Carolina, Agent Wisniewski tore up the documented notes he made on my responsed to the questions asked to me." Exhibit 6.

### AGREEMENT

### I. THE GOVERNMENT HAS WAIVED ITS ABILITY TO ASSERT ANY FOIA EXEMPTIONS BECAUSE THE REQUESTED STATEMENTS HAVE BEEN PLACED IN THE "PUBLIC DOMAIN"

In considering this claim to overcome the DEA withholding the statements of Mann, Rubel, Draper, Dunning, Eversole, and Sinclair the government relies

solely on one exemption and that is: "disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy, see § 5 U.S.C. 552(b)(7)(c)." Exhibit 3.

Since, the requested statements were testified to during Plaintiff's trial and sentencing hearing the statements have been released into the public domain through judicial proceedings.

Under the public domain doctrine, records which otherwise may be exempt from disclosure under the FOIA lose their protective cloak once disclosed and preserved in a permanent public record. The court held in, Cottone v. Reno, 193 F.3d 550, 554 (D.C. Cir. 1999). Where information requested in truly public, then enforcement of an exemption cannot fulfill its purposes." Below Plaintiff setforth evidence from his trial transcripts and sentencing transcripts that establish that Plaintiff meets the burden that there is permanent public records that mimic or are exactly as the statements Plaintiff seeks to have turned over in their entirety.

Plaintiff first began by referring to the withheld statement that is within Plaintiff's PSR on page 7 under the heading "codefendant statements". paragraph 14.

> "On May 15, 1996, Richard Mann was interviewed by investigative agents and reported he became acquainted with Torrance Jones, while he (Mann) was in high school in Homestead, Florida... In December 1994, Rubel and Mann began selling cocaine for Bourgoine. In April 1995, Rubel and Mann returned to Homestead and Rubel ultimately moved to Raleigh, North Carolina... Mann was instructed by Bourgoine to obtain the cocaine from Torrance Jones. After Christman 1995, Mann met William Lewis in Miami several weeks after this meeting. Mann traveled to Raleign for Torrance

Jones in order to transport 1 kilograms of cocaine
to Rubel. While in Raleigh, Mann obtained $2,000
from Lewis, which he provided to Torrance Jones.
Two weeks later, Mann was returning to Raleigh
with 1 kilogram of cocaine supplied by Torrance,
which was intended for Rubel, when Torrance Jones
added an additional 6 ounces of cocaine to be
supplied to Lewis." Exhibit 5 . P.S.R. statement.

Here is Richard Mann's trial testimony. This testimony is on direct
examination by AUSA Christine Hamilton.

Q. How long did you work as a drug courier?

A. Since January of '95.

Q. Who did you work for?

A. Mike.

Q. Mike who?

A. Rubel.

T.T. - 97

Q. Who did you get drugs from?

A. Torrance.

Q. Torrance who?

A. Jones.

T.T. - 98

Q. Please describe for the jury how it happened
that you would pick up drugs for Torrance
Jones and what you did with them after
you got them.

A. Mike would call me and tell me he needs
a package. And then I would just call
Torrance and go pick it up.

T.T. - 98

Q. And where would you go and pick up the
cocaine?

A. Torrance's home.

T.T. - 98

-- 6 --

Q. What would you do after you got to the
   house?

A. Just talk and then wrapped the package
   up and leave.

Q. And what would you wrap up?

A. A key.

Q. Kilo?

A. Sometimes and that was right near the end.

                                        T.T. - 99

Q. And did you ever wrap up more than a kilo?

A. Twice.

Q. And how much more?

A. Two keys.

Q. Where would you carry the drugs when
   you used the airplane?

A. Between my legs.

                                        T.T. - 100

Q. After you got to Raleigh with the package
   when you used the airplane what did you do?

A. I would call up either Mike or Danny.

                                        T.T. - 101

Q. And did they ever give you anything in
   exchanged for the package?

A. Sometimes.

Q. And what would they give you?

A. Money.

Q. And when they gave you money what did you
   do with the money?

A. Went back to Miami and gave it to Torrance.

                                        T.T. - 102

- 7 -

Q. How did you meet Flash?

A. Through Torrance.

A. The first time I met him was at my house
   in Miami.

Q. When is the next time you saw him?

A. In North Carolina.

Q. And what were the circumstances of seeing
   him in North Carolina?

A. I pick up a couple thousand from him.

                                    T.T. - 103

Q. And then what did you do with it?

A. Gave the money to Torrance.

Q. Did you ever see Flash [Milton Lewis] again?

A. A couple - about a month later.

                                    T.T. - 104

Q. What happened during that trip?

A. I came up here to see Mike and then
   I called up Flash and - because I
   had something for Flash also.

Q. What did you have for Flash?

A. About a quarter key.

Q. Of what?

A. About five ounces of crack and the
   rest powder.

                                    T.T. - 105

Q. All right. Prior to going to the airport
   in Miami, did you go to Torrance's?
   How did you get the drugs?

A. Oh, yes. Went to Torrance's.

A. I got Mike's package and I got Torrance's
   package.

Q. And Torrance's package or Flash's package?

A. Flash's package.

Q. And who told you whose package was which?

A. Well, I knew Mike was getting a key, so.

T.T. - 107

Q. Then what happened?

A. Then the first time Flash met me at the airport and then I gave him his and met up with Mike.

Q. And after you made the delivery to Flash, how did you get the kilo to Michael Rubel?

A. I met up with Mike at a store.

T.T. - 108

Q. Tell the jury what happened when you got stopped in the airport, where you were and what happened.

A. I flew up to Raleigh and flew about an hour later I was coming –

Q. What did you have when you flew to Raleigh?

A. A Key.

Q. A kilo?

A. For Mike.

T.T. - 109

Q. So you switched from airplane to car. How did that next trip go? Explain to the jury what happened.

A. The driving trip?

Q. Yes.

A. Just I went up to well, Mike called me and said he needed something. So I went to call Torrance and met up with him. Then I went over to Torrance's house, got the package. I got two keys because I started driving. And then drove to Raleigh.

T.T. - 110

Next, government witness Michael Rubel provided a statement to the AUSA and investigative agents on July 29, 1996 which is also in Plaintiff's PSR as stated below.

> "On July 29, 1996, Michael Rubel was interviewed by investigative agents and reported he met Roger Bourgoine, Mann, and Torrance Jones while he (Rubel) was in high school in Florida... In the spring of 1995, Rubel moved back to Raleigh. In August 1995, Mann brought 2 ounces of cocaine to Lewis which was intended for an unindicted coconspirators. The cocaine was supplied by Bourgoine. Rubel also met Lewis in August 1995. When Mann delivered ½ kilogram of cocaine to Lewis. Rubel also recalled an incident when Lewis and Torrance Jones drove to Raleigh to meet a courier who transported 1 kilogram of cocaine. All three met at Rubel's apartment and Rubel was provided with 1 ounce of cocaine. Rubel also reported that Charles Manchester transported cocaine from Torrance Jones on three occasions in January 1996. On each trip, the individual provided 1 kilogram of cocaine. Some of the cocaine was provided to Rubel and some was provided to Lewis." Exhibit 5 .

Q. Did Torrance Jones ever come to Raleigh?

A. Yes, ma'am.

Q. How many times do you remember him coming to Raleigh?

A. Two times.

                                                    T.T. - 156

Q. Now Torrance Jones and Flash drive to North Carolina; what happens?

A. Apparently Milton Lewis had to make a delivery. He left a portion of the cocaine with Torrance and he went and did his business.

Q. And after that was done, did you get some of the drugs?

A. Yes, ma'am. I got approximately two ounces.

                                                    T.T. - 157

- 10 -

Q. You said there was a second time you
   remember Torrance Jones coming to
   Raleigh; what do you remember about
   the trip?

A. On the trip Charles Manchester was sent
   up on the plane along with the drugs.
   So, I pick him up from the airport and
   then Torrance and his girlfriend drove
   up. I guess it was somewhat of a vacation.
   And we all just met up at my house, and
   I paid him for one kilo.

                                    T.T. - 158

Q. Now, did you know the Charles Manchester?

A. Yes, I did.

Q. How did you know him?

A. He was a friend.

Q. What did he do for Torrance Jones?

A. That time he was delivering a couple
   of things. He had delivered twice to me.
   That's as far as I know what he did
   with Torrance Jones.

                                    T.T. - 159

Q. Now, were any other - did anyone else
   receive any drugs on that occasion -
   that last occasion just before your arrest?

A. Yes, ma'am.

Q. And who actually transported those two
   kilograms for Florida to Raleigh?

A. Richard Mann.

Q. And how did he get your attention when
   he came by your house?

A. He was down below my window throwing
   pennies up at it.

Q. And after you woke up what did you tell
   him to do?

- 11 -

> A. He wanted to leave it with me there
>    because he had other things to do.
>    I told him no. I said, go and wake
>    Daniel up.
>
> Q. What else did he have to do?
>
> A. He had to make a delivery to Flash.

T.T. - 165

Ricky Draper's statement is in Plaintiff's PSR on page 9, paragraph 18
under the title "Coconspirator Statement" and it holds:

> "On September 15, 1996, Ricky Draper was
> interviewed by investigative agents. Draper
> advised he was introduced to Torrance Jones in the
> winter of 1994 and subsequently began purchasing
> cocaine from Jones. For the first few months,
> Draper purchased multiple ounce quantities.
> However, after the first three months. Draper
> began purchasing this quantity of cocaine for at
> least one year, which equates to approximately 13
> kilograms of cocaine (250 grams per week x 52
> weeks). Additionally, Draper was aware Torrance
> Jones was supplying another individual with
> cocaine base during this same time period. Draper
> advised the individual sold $\frac{1}{2}$ kilogram of cocaine
> on a weekly basis and his sole source of supply
> was Torrance Jones. This equates to 26 kilograms
> of cocaine base (500 grams per week x 52 weeks).
> Exhibit 5 .

Although Draper never testified, Agent Brad Kennon did testify during
Plaintiff's sentence hearing to exactly what was Draper had stated in his
statement. Plaintiff refers to pages 12-14 of the sentencing transcript in which
AUSA Christine Hamilton is on direct examination of Agent Brad Kennon.

> Q. Did you subsequently interview this
>    Ricky Draper?
>
> A. Yes, ma'am.
>
> Q. Could you please tell the Court what
>    Ricky Draper related to you concerning
>    his involvement with Torrance Jones?

- 12 -

A. Mr. Draper said he was introduced to
Roger Begoin.

Q. Roger Begoin is the individual that
during trial Mr. Rubel said was Torrance
Jones' partner?

A. Yes, ma'am.

A. ...Draper then purchased cocaine from
Torrance Jones for approximately 18 months.

Q. Now did he purchase cocaine or crack cocaine?

A. Powder cocaine. He purchased cocaine from
Torrance Jones weekly. He then stated
that he had knowledge that Torrance
Jones supplied another individual named
Joey Senacola..., and that he supplied
Joey Senacola with large quantities of crack
cocaine, and that Joey Senacola was known
to him as "cookie man" and that he lived
in Port Charlotte, Florida.

Q. And what was the total quantity of
crack cocaine Ricky Draper indicated
he was aware of that Torrance Jones
had sold to Joey Senacola?

A. In the report he [Ricky Draper] gave
weekly amounts. I think probation
came up with approximately 26 kilograms
of base cocaine.

Q. Based on your calculations of the
weekly amount?

A. Yes, ma'am.

Q. Which were what?

A. In the statement [of Ricky Draper] here,
Draper stated that he knew Torrance
Jones was supplying Joey Senacola with
crack cocaine, and the large quantities
were approximately one-half kilo weekly,
and that Joey Senacola's only supplier
was Torrance Jones.

Daniel Dunning's statement is in Plaintiff's PSR on page 7, paragraph 15
under the title "Codefendant Statement". Daniel Dunning stated:

> "On July 29, 1996, Daniel Dunning was interviewed
> by investigative agents and advised he became
> acquainted with Eversole... While in college,
> Dunning and Eversole later became roommates.
> During August 1995, Dunning, Eversole, and Merrick
> moved to 420 Colleton Road, Raleigh, North
> Carolina. In December 1995, Dunning moved to 9009
> Langewood Drive, at which time Rubel asked him to
> store cocaine at the location. Between December
> 1995 and April 1996, Richard Mann brought a total
> of 4 kilograms of cocaine to Dunning's residence
> during three trips to North Carolina." Exhibit 5 .
> (Summarize)

Brian Eversole's statement is in Plaintiff's PSR on page 8 and 9, paragraph

17 under the title "Codefendant Statement". Brian Eversole stated:

> "On July 29, 1996, Brian Eversole was interviewed
> by investigative agents and advised he moved to
> Raleigh in 1990 and eventually met Rubel and
> Dunning. They ultimately began selling small
> amounts of drugs together... In late spring or
> early summer 1995, Rubel returned to Raleigh and
> arranged for Mann to bring cocaine to Raleigh from
> Florida... Eversole recalled Merrick began
> obtaining cocaine directly from Rubel and was
> receiving $\frac{1}{4}$ to $\frac{1}{2}$ kilogram of cocaine each time.
> Eversole recalled Merrick receiving approximately
> 3 kilograms of cocaine from Rubel during the
> period from December 1995 to late March 1996.
> Exhibit 5 . (Summarize)

During Plaintiff's trial Agent Anthony Wisniewski testified about the very

statements Daniel Dunning and Brian Eversole[1] had provided to Agent Wisniewski

and others during attorney Bridgette Aguire's cross-examination. Trial

transcript pages 163-164.

---

[1]   Plaintiff would like to establish that both Dunning and Eversole pleaded
guilty to the drug charges. However, during the plea hearing both stated
on the record or agreed to the very statements discussed above.

Q. Detective, you indicated that the original controlled buy came from 420 Collington [sic] Road?

A. Yes, ma'am.

Q. And that was a residence in which Brian Eversole and Brett Merrick lived?

A. Brett Merrick, yes, ma'am.

Q. Brett - excuse me, Brett Merrick. And as a part of that investigation you spoke with both of those individuals?

A. Yes, ma'am.

Q. And as part of that investigation you learned that they believe that a person known as Beavis was the source of cocaine that they were receiving?

A. The actual specifics were not gone over only by me, myself and Detective Kennon went back and forth as to what they told us. That was part of the information, yes, ma'am.

Q. And it was part of the information that Beavis was the source from Florida; is that correct?

A. He brought the drugs up to Florida - from Florida correction to several other people that were arrested later on.

Q. And as part of that investigation you also interviewed or spoke with a Daniel Dunning?

A. Yes, ma'am.

Q. And as part of that investigation you learned from Mr. Dunning that he also named Beavis as the source from Florida?

A. Yes, after he became a cooperating defendant, yes, ma'am.

Plaintiff has pointed to specific publically disclosed trial testimony that is identical to those statements (i.e. Richard Mann; Michael Rubel; Ricky Draper; Daniel Dunning; Brian Eversole) that are being withheld. The Honorable

Judge Amy B. Jackson has issued a favorable ruling in Plaintiff's case no. 10-CV-02074 (ABJ) concerning this very issue of the suppressed statements being placed in the "public domain" by holding: "Thus plaintiff has met his burden on summary judgement by pointing to specific information in the public domain that appears to duplicate that its being withheld." See Dkt. No. 17 "Memorandum Opinion" pages 9 through 11.

## CONCLUSION

Plaintiff prays that this motion be granted and all the withheld statements be immediately provided to Plaintiff.

RESPECTFULLY SUBMITTED,

Torrance Jones
Reg. 19267-018
P.O. Box 1000
Petersburg, VA 23804-1000

Submitted ~~September~~ Dec 30, 2012.

- 16 -



**U.S. Department of Justice**
Drug Enforcement Administration
FOI/Records Management Section
8701 Morrissette Drive
Springfield, Virginia 22152

SEP 0 1 2010

Case Number: 10-00572-FP

Subject: JONES, TORRANCE AND INFORMATION ON THIRD PARTIES: MANN,
RICHARD; RUBEL, MICHAEL; DRAPER, RICKY; SINCLAIR, BERNARD; DUNNING,
DANIEL; AND EVERSOLE, BRAIN REGARDING INTERVIEWS FOR UNITED STATES V.
TORRANCE JONES

Torrance Jones
Reg. No. 19267-018
FCI Petersburg
P.O. Box 1000
Petersburg, VA 23804

13 0129

**FILED**

JAN 3 0 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Dear Mr. Jones:

This letter responds to your Freedom of Information/Privacy Act (FOI/PA) request dated
May 29, 2010, addressed to the Drug Enforcement Administration (DEA), Freedom of
Information/Privacy Act Unit (SARF), seeking access to information regarding the above subject.

The processing of your request identified certain materials that will be released to you with
this letter. Portions not released are being withheld pursuant to the Freedom of Information Act, 5
U.S.C. 552, and/or the Privacy Act, 5 U.S.C. 552a. Please refer to the list enclosed with this letter
that identifies the authority for withholding the deleted material, which is indicated by a mark
appearing in the block next to the exemption. An additional enclosure with this letter explains these
exemptions in more detail.

Your request for information pertaining to other individuals, Richard Mann; Michael Rubel;
Ricky Draper; Bernard Sinclair; Daniel Dunning and Brian Eversole, has been received and will not
be processed by the Drug Enforcement Administration. This response neither confirms nor denies
the existence of any requested records. Before DEA can begin processing your request, it will be
necessary for you to provide either proof of death or an original notarized authorization (privacy
waiver) from these individuals. Two forms are enclosed to assist you with meeting this
requirement.

Proof of death can be a copy of a notarized death certificate, obituary, or a recognized
reference source. Waivers of personal privacy must be notarized, must specifically identify the
person waiving privacy (including full name, date and place of birth, social security number and
present address), and must be specifically directed to the DEA -- permitting the DEA to release
personal information (about the person executing the waiver) from its files. The waiver should be
dated within a reasonable time period preceding the request, and the original copy of the waiver
must be provided to the DEA.

If you submit either a copy of the proof of death or an original notarized authorization directly to the DEA, we will conduct a search of our records. In addition, to ensure an accurate search of our records, please provide your subject's complete name, date and place of birth, and social security number if you have not already done so.

Without proof of death or an original notarized authorization, to confirm the existence of law enforcement records or information about another person is considered an unwarranted invasion of personal privacy. Such records would be exempt from disclosure pursuant to Exemptions (b)(6), (b)(7)(C), (b)(7)(D), (b)7(F) and/or of the Freedom of Information Act (FOIA), Title 5 U.S.C. Section 552.

The rules and regulations of the Drug Enforcement Administration applicable to Freedom of Information Act requests are contained in the Code of Federal Regulations, Title 28, Part 16, as amended. They are published in the Federal Register and are available for inspection by members of the public.

If you wish to appeal any denial of your request, you must make your appeal in writing and it must be received by the Office of Information Policy within sixty (60) days of the date of this letter pursuant to 28 C.F.R. 16.9. The appeal should be sent to the following address with the envelope marked "FOIA Appeal":

U.S. DEPARTMENT OF JUSTICE
OFFICE OF INFORMATION POLICY
NYAV BUILDING, 11TH FLOOR
WASHINGTON, D.C.  20530

If you have any questions regarding your request, you may contact FOI Specialist A. Hertel on 202-307-4285.

Sincerely,

*Katherine Myrick*

Katherine L. Myrick, Chief
Freedom of Information/Privacy Act Unit
FOI/Records Management Section

Enclosures

Number of pages withheld:   01

Number of pages released:   25

*Exhibit 3*

**U.S. Department of Justice**

Office of Information Policy

Telephone (202) 514-3642                    Washington D C 20530

# FILED
### JAN 3 0 2013
**Clerk, U.S. District & Bankruptcy Courts for the District of Columbia**

*13 0123*

Mr. Torrance Jones
Register No. 19267-018
Federal Correctional Institution
Post Office Box 1000
Petersburg, VA 23804

Re:    Appeal No. 2010-3261
Request No. 10-00572-P
ADW:MWH

Dear Mr. Jones:

You appealed from the action of the Drug Enforcement Administration (DEA) on your request for access to records pertaining to yourself and statements made by third parties. I note that you have limited your appeal to that portion of DEA's response pertaining to your request for third-party records.

After carefully considering your appeal, I am affirming, on partly modified grounds, DEA's action on your request. Please be advised that DEA did not conduct a search for the requested third-party records. To the extent that such records exist, without consent, proof of death, official acknowledgment of an investigation, or an overriding public interest, disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy. See § 5 U.S.C. § 552(b)(7)(C).

Furthermore, I am denying your request that we itemize and justify each item of the information withheld. You are not entitled to such a listing at the administrative stage of processing Freedom of Information Act requests and appeals. See Judicial Watch v. Clinton, 880 F. Supp. 1, 11 (D.D.C. 1995).

Finally, I note that on appeal you seek various additional records that you did not originally request. You may not on appeal expand the scope of your initial request. It appears that you are now seeking records pertaining to your prosecution in federal court. If you are seeking records pertaining to your federal prosecution and have not done so already, I suggest that you submit a request to the Executive Office for United States Attorneys (EOUSA) for the records that you seek. Requests for EOUSA records should be addressed to:

William G. Stewart II, Assistant Director
FOIA/Privacy Unit
Executive Office for United States Attorneys
Department of Justice
Room 7300, 600 E Street, NW
Washington, DC 20530-0001

-2-

As part of the 2007 FOIA amendments, the Office of Government Information Services (OGIS) was created to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. The contact information for OGIS is:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, MD 20740-6001; e-mail at ogis@nara.gov; telephone at 301-837-1996; toll free at 1-877-684-6448; or facsimile at 301-837-0348.

If you are dissatisfied with my action on your appeal, you may file a lawsuit in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Janice Galli McLeod
Associate Director

*Exhibit 4*

# FEDERAL PUBLIC DEFENDER
## EASTERN DISTRICT OF NORTH CAROLINA

EDWIN C. WALKER
Acting Federal Public Defender

Post Office Box 25967
Raleigh, NC 27611-5967
919-856-4236

Montague Bldg., Suite 300
128 E. Hargett Street
Raleigh, NC 27601

January 3, 1997

FILED

JAN 30 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Christine Hamilton
Assistant United States Attorney
310 New Bern Avenue
Suite 800, Federal Building
Raleigh, NC 27601-1461

RE: Milton Lewis/ Drug Quantity and Sentencing

13 0123

Dear Ms. Hamilton:

I understand from probation that you have disputed the quantity of drugs that they have found attributable to Mr. Lewis for purposes of sentencing. I understand that your position is based on statements made by the following persons on the following dates:

Richard Mann- May 15, 1996
Daniel Dunning- July 24, 1996
Mike Rubel- July 29, 1996
Brian Eversole- July 29, 1996.

It is my understanding from probation that you believe these statements are inconsistent with trial testimony presented and that these statements would support a finding of a greater quantitiy of drugs than that testified to under oath during trial. As you know, I, on Mr. Lewis' behalf, was never supplied with these statements either as a part of discovery, pursuant to Jencks or as Brady material for cross-examination based on the inconsistency of the statements. I am requesting that I be supplied with copies of these statements forthwith, as well as any other statements that are inconsistent in any manner with testimony presented at trial.

Very truly yours,

Susan Seahorn
Assistant Federal Public Defender

cc Court file in U.S. v. Milton Lewis 5:96-CR-79-BO3

TORRANCE JONES
Page 7

12.    Rubel also testified that TORRANCE JONES traveled to Raleigh on two occasions. The first trip was with Milton Lewis and involved the distribution of an unspecified amount of cocaine. Later testimony established 1 kilogram of cocaine was delivered by Lewis and TORRANCE JONES. Rubel received 2 ounces of the cocaine and the remainder was provided to Lewis. The second trip TORRANCE JONES made was with Charles Manchester and involved the delivery of 1 kilogram of cocaine. Charles Manchester met with Rubel on two additional occasions to deliver unspecified amounts of cocaine. It is noted in a statement provided to investigative agents on July 29, 1996, Rubel reported each of the trips made by Chandler involved 1 kilogram of cocaine. Rubel also testified that he had met Lewis twice before his arrest in the instant matter. The first meeting involved the transaction referenced above involving TORRANCE JONES. During the second meeting, Lewis obtained an unspecified amount of cocaine. Cross examination established that Rubel was uncertain as to whether Lewis received cocaine or cocaine base during his trips to Raleigh.

13.    Mann testified that he began working as a courier for Mann in May 1995. Rubel would contact Mann indicating he needed cocaine and Mann would subsequently obtain the cocaine from TORRANCE JONES. On one trip in January or February 1996, Mann transported 1 kilogram of cocaine to Rubel and 1/4 kilogram (9 ounces) of cocaine to Lewis. Lewis' package included 5 ounces of cocaine base (141.75 grams) and the remainder (4 ounces) was cocaine (113.4 grams). TORRANCE JONES compensated Mann for making the delivery to Lewis. Mann also delivered 1/4 kilogram of cocaine (255.15 grams) to Lewis on a second occasion. Mann did not know if this delivery involved cocaine or cocaine base.

Codefendant statements

14.    On May 15, 1996, Richard Mann was interviewed by investigative agents and reported he became acquainted with TORRANCE JONES, Roger Bourgoine, and Michael Rubel while he (Mann) was in high school in Homestead, Florida. After graduating from high school in 1994, Mann and Rubel moved to Tallahassee, Florida. In December 1994, Rubel and Mann began selling cocaine for Bourgoine. In April 1995, Rubel and Mann returned to Homestead and Rubel ultimately moved to Raleigh, North Carolina. After moving to Raleigh, Rubel contacted Mann and informed him an unindicted coconspirator would be traveling to Florida to obtain cocaine. Rubel instructed Mann to obtain the cocaine from Bourgoine. This individual traveled to Florida eight or nine times to obtain cocaine and was accompanied by Eversole on at least one trip. During the late summer or early fall of 1995, Mann began traveling to Raleigh for Bourgoine to transport large quantities of cocaine to Rubel. Mann estimated making fifteen such trips to Raleigh with cocaine supplied by Bourgoine until August 1995, when Bourgoine relocated to Georgia. At that time, Mann was instructed by Bourgoine to obtain the cocaine from TORRANCE JONES. After Christmas 1995, Mann met Milton Lewis in Miami. Several weeks after this meeting, Mann traveled to Raleigh for TORRANCE JONES in order to transport 1 kilogram of cocaine to Rubel. While in Raleigh, Mann obtained $2,000 from Lewis, which he provided to TORRANCE JONES. Two weeks later, Mann was returning to Raleigh with 1 kilogram of cocaine supplied by TORRANCE JONES, which was intended for Rubel, when TORRANCE JONES added an additional 6 ounces of cocaine to be supplied to Lewis. This information is protected pursuant to the provisions of 1B1.8.

15.    On July 24, 1996, Daniel Dunning was interviewed by investigative agents and advised he became acquainted with Eversole and Chandler while in college. Dunning and Eversole later became

**FILED**

JAN 3 0 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

roommates.  Dunning met Rubel in August 1994, when they were employed at the same location.
Dunning, Eversole, and Rubel became friends and started drinking and smoking marijuana together.
In December 1994, Dunning overheard Eversole, Rubel, and an unindicted coconspirator discussing the
sale of cocaine.  In January or February 1995, Dunning began obtaining cocaine from Eversole and later
from Rubel for resale to his employer.  During this time-frame, Eversole and the unindicted
coconspirator began selling cocaine to Brett Merrick.  During the summer of 1995, the unindicted
coconspirator and Eversole began making trips to Florida to purchase cocaine.  Dunning estimated the
unindicted coconspirator made eight or nine trips to obtain approximately 9 ounces per trip (72
ounces/2,041.2 grams).  Eversole accompanied this individual on a few occasions.  During August 1995,
Dunning, Eversole, and Merrick moved to 420 Colleton Road, Raleigh, North Carolina.  Eversole and
Dunning each had several ounce quantity customers.  Merrick also had his own customers and
purchased cocaine from Eversole and Dunning.  However, Merrick later contacted Rubel directly to
obtain cocaine.  In December 1995, Dunning moved to 9009 Langewood Drive, at which time Rubel
asked him to store cocaine at the location.  Between December 1995 and April 1996, Richard Mann
brought a total of 4 kilograms of cocaine to Dunning's residence during three trips to North Carolina.
Dunning was arrested approximately one week after the final shipment.  This statement is protected
pursuant to the provisions of 1B1.8.

16.    On July 29, 1996, Michael Rubel was interviewed by investigative agents and reported he met Roger
       Bourgoine, Mann, and **TORRANCE JONES** while he (Rubel) was in high school in Florida.  In early
       1994, Rubel moved to Raleigh, North Carolina, where he met Dunning.  Dunning and Rubel became
       friends and Rubel was introduced to Eversole.  Eversole ultimately began talking about selling cocaine
       and the profit they could make from the sales.  In October 1994, Rubel returned to Tallahassee, Florida.
       However, due to problems securing work, Rubel began speaking with Eversole about selling cocaine.
       In November 1994, Rubel drove to Raleigh with cocaine fronted by Bourgoine.  This cocaine was sold
       to Eversole.  In December 1994, Rubel brought 1/2 ounce of cocaine to Eversole.  Rubel made three
       to four more trips to Raleigh in 1994, bringing drugs each time (quantity not specified).  In the spring
       of 1995, Rubel moved back to Raleigh. In August 1995, Mann brought 2 ounces of cocaine to Lewis,
       which was intended for an unindicted coconspirator.  The cocaine was supplied by Bourgoine. Rubel
       also met Lewis in August 1995, when Mann delivered 1/2 kilogram of cocaine to Lewis.  Rubel also
       recalled an incident when Lewis and **TORRANCE JONES** drove to Raleigh to meet a courier who
       transported 1 kilogram of cocaine.  All three met at Rubel's apartment and Rubel was provided with
       1 ounce of cocaine.  In the fall of 1995, Rubel met Merrick when Merrick obtained 1/4 kilogram of
       cocaine.  Rubel reported the least quantity of cocaine Merrick obtained was 6 to 7 ounces.  Rubel began
       having domestic problems at that time.  As a result, he arranged for Dunning to meet Mann when Mann
       delivered cocaine to North Carolina.  Dunning also began to store the cocaine delivered by Mann and
       supplied Merrick and Eversole with cocaine.  Between September 1995 and the time of his arrest in
       March 1996, Rubel reported that Merrick received 9 to 11 ounces of cocaine on approximately ten
       separate deliveries of cocaine (2,551.5 grams). Rubel also reported that Charles Manchester transported
       cocaine from **TORRANCE JONES** on three occasions in January 1996. On each trip, the individual
       provided 1 kilogram of cocaine.  Some of the cocaine was provided to Rubel and some was provided
       to Lewis.  Trial testimony indicates at least one kilogram of the cocaine delivered by Manchester was
       provided to Lewis. This statement is protected pursuant to the provisions of 1B1.8.

17.    On July 29, 1996, Brian Eversole was interviewed by investigative agents and advised he moved to
       Raleigh in 1990 and eventually met Rubel and Dunning.  They ultimately began selling small amounts

of drugs together. Rubel moved to Florida, but returned on one occasion to deliver cocaine which Rubel and Eversole sold together. Rubel was also introduced to one of Eversole's customers. Rubel subsequently began bringing cocaine to Raleigh two times per month for several months in order that it could be distributed. Eversole later introduced an unindicted coconspirator to Rubel, at which time Rubel requested Eversole and this individual travel to Florida. On approximately four or five occasions, Eversole and the unindicted coconspirator traveled to Florida to obtain cocaine. The coconspirator also made four or five trips on his own to obtain cocaine. In late spring or early summer 1995, Rubel returned to Raleigh and arranged for Mann to bring cocaine to Raleigh from Florida. Eversole later met Merrick, who was being supplied by the unindicted coconspirator. In the fall of 1995, Merrick moved into Eversole's home on Colleton Road and received several ounces of cocaine from Eversole. This cocaine was supplied by Dunning through Rubel. Eversole reported Merrick began obtaining cocaine directly from Rubel and was receiving 1/4 to 1/2 kilogram of cocaine each time. Eversole recalled Merrick receiving approximately kilograms of cocaine from Rubel during the period from December 1995 to late March 1996. Eversole also reported selling to Chandler on at least two occasions. This statement is protected pursuant to the provisions of 1B1.8

## Coconspirator Statement

18    On September 15, 1996, Ricky Draper was interviewed by investigative agents. Draper advised he was introduced to TORRANCE JONES in the winter of 1994 and subsequently began purchasing cocaine from Jones. For the first few months, Draper purchased multiple ounce quantities. However, after the first three months, Draper began purchasing at least 1/4 kilogram and typically 1/2 kilogram of cocaine on a weekly basis. Draper continued purchasing this quantity of cocaine for at least one year, which equates to approximately 13 kilograms of cocaine (250 grams per week X 52 weeks). Additionally, Draper was aware TORRANCE JONES was supplying another individual with cocaine base during this same time period. Draper advised the individual sold 1/2 kilogram of cocaine on a weekly basis and his sole source of supply was TORRANCE JONES. This equates to 26 kilograms of cocaine base (500 grams per week X 52 weeks). 18 USCA 3661
(use of interview for sentencing)

## Roles/Drug Quantity

19.    Based upon the preceding, TORRANCE JONES is considered to have maintained a managerial role in the offense. TORRANCE JONES employed couriers, including Freddy Jones and Milton Lewis, who facilitated the transmission of cocaine/cocaine base to North Carolina. He also compensated the couriers for their involvement in the offense. Based upon the trial testimony of Rubel indicating Rubel received kilograms of cocaine during the offense, Mann's trial testimony indicating on one occasion, he transported 5 ounces of cocaine base (141.75 grams) to Lewis at the direction of TORRANCE JONES, the statement of Draper outlining Jones' involvement in distributing kilograms of cocaine and kilograms of cocaine base, and the seizure of cocaine and cocaine base from Freddy Jones on April 13, 1996, TORRANCE JONES will be held accountable for kilograms of cocaine and kilograms of cocaine base for purposes of guideline calculations. Rubel, Mann, and Dunning will also be held accountable for kilograms of cocaine supplied by TORRANCE JONES.

20.    TORRANCE JONES put the government to its burden of proof during trial proceedings and subsequently did not provide a statement to the probation officer in which he detailed his instant conduct.

## AFFIDAVIT OF BERNARD SINCLAIR

Before me, Bernard Sinclair, (hereinafter Sinclair) who was sworn and says that the forgoing content is accurate and true to the best of his knowledge

1. I, Sinclair, was interviewed by certified investigator (A8700205) Recho Bell on January 18, 2000.

2. The interview took place at Jefferson Correction Institution where I am presently housed.

3. During the interview I stated the below information freely

4. I, Sinclair, was interviewed by Agents Brad Kennon and A.J. Wisniewski for approximately two hours (3:00-5:00 p.m.) on a Saturday or Sunday afternoon immediately prior to the 1996 Federal trial of Torrance Jones, Freddie Jones and Milton Lewis.

5. The interview was intense and focused on Torrance Jones. This interview was conducted in a North Carolina jail.

6. During the interview the Agents questioned me concerning Torrance Jones. One of my responses to a question was that I didn't traffic drugs for Torrance Jones to North Carolina. Another response was that I didn't have anything to do with drugs in North Carolina.

7. Apparently Agent A.J. Wisniewski was upset that I would not give him false information while responding to his questions about Torrance Jones and being involved with narcotics.

8. I wasn't asked any questions about Milton Lewis. If the agents would have questioned me on Milton Lewis and narcotics, my response is that I have never dealt drugs with Milton Lewis.



FILED

1⁰ 129           ⁵ ⁰913
              Cle,           Bankruptcy
              Con      ᵦₑ ₕᵢₛ   Columbia

EXHIBIT
___A___

9.    Agents Brad Kennon and A.J. Wisniewski asked less than ten questions about Freddie
      Jones. My answers were essentially used to recognize him (Freddie Jones) from the
      Polaroid snap shots as the father of Torrance Jones There were no direct drug-related
      questions in regards to Freddie Jones. And, I have never known Freddie Jones to be
      involved with drugs.

10.   I was not questioned about a Michael Rubel I don't know of a Michael Rubel, nor have I
      met him anywhere or given any phone numbers to him.

11    Both Agents showed me pictures of Torrance Jones, Freddie Jones and Milton Lewis I
      recognized the men in the three Polaroid snap shots.

12.   The Agents continually threatened me with a life sentence. Eventually Agent Wisniewski
      tore up the documented notes he made on my responses to the questions asked to me.

13.   I, Sinclair, am willing to testify to the information I have provided within this affidavit.


Beyond the above, the affiant sayeth not


_Bernard Sinclair_
Bernard Sinclair


Notary:
Sworn and subscribed before me this
10th day of March 2000

Rhonda A. Peters
_Rhonda A. Peters_


Rhonda A. Peters
MY COMMISSION # CC540679 EXP
March 17, 2000
BONDED THRU TROY FAIN INSURANCE, I

## NOTARY CERTIFICATE

STATE OF FLORIDA    )
                    ) ss
COUNTY OF JEFFERSON )

**BEFORE ME** this day personally appeared Sinclair, Bernard who being first duly sworn, deposes and says that the foregoing is true and correct.

Bernard Sinclair
**AFFIANT**

AFFIANT produced a D.O.C INMATE I.D card as identification. # 784978

**SWORN TO AND SUBSCRIBED BEFORE ME** this 10th day of March 2000.

Rhonda A. Peters
MY COMMISSION # CC540679 EXPIRES
March 17, 2000
BONDED THRU TROY FAIN INSURANCE, INC.

Rhonda A. Peters
Rhonda A. Peters

MY COMMISSION EXPIRES                    NOTARY PUBLIC